## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

MARSHA E. LEWIS,                          :
    Plaintiff,                       :
                                :          CIVIL ACTION
               v.                :
                                :          NO. 10-2935
GENESIS HEALTHCARE CORP.,                  :
    Defendant.                       :

**October _24, 2011**                                      **Anita B. Brody, J.**

## MEMORANDUM

Plaintiff Marsha E. Lewis brings suit against Defendant Garden Spring Center,[1] alleging that Garden Spring Center terminated her in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 951 *et seq.*[2]  Additionally, Lewis alleges that Garden Spring Center failed to accommodate her disability in violation of the ADA.  I exercise federal question jurisdiction over Lewis's ADEA

---

[1] Lewis brings this action against Genesis HealthCare Corp., also known as Geriatric and Medical Service, Inc., also known as Garden Spring Center.  Defendant asserts that its proper name is Healthcare Resources Corporation d/b/a Garden Spring Center.  In this opinion, Defendant will be referred to as Garden Spring Center, the only mutually agreed upon name.

[2] "[T]he same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA.  It is similarly proper to address [ADEA and PHRA age discrimination claims] collectively." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010) (alteration in original) (citations omitted) (internal quotation marks omitted).  This opinion will only reference the ADA and the ADEA because any result reached under these statutes applies equally to Lewis's discrimination claims under the PHRA.

and ADA claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over her PHRA claim pursuant to 28 U.S.C. § 1367.  Garden Spring Center has filed a motion for summary judgment.  For the reasons set forth below, I will grant Garden Spring Center's motion for summary judgment on Lewis's ADA claims, and deny the motion on Lewis's ADEA claim.

## I.  BACKGROUND[3]

### A.  Lewis's Work at the Garden Spring Center

Marsha Lewis is a sixty-seven-year-old Licensed Practical Nurse ("LPN").  In 1988, she began working at Garden Spring Center, a nursing facility located in Willow Grove, PA.   As a result of several medical problems, Lewis left Garden Spring Center in 1997.  However, Lewis was subsequently rehired by Garden Spring Center in 1999.

From 2001 until her termination in 2008, Lewis worked in Section Three of Garden Spring Center as an LPN on the 3:00 p.m. to 11:00 p.m. shift.  Section Three housed approximately forty-nine residents.  Two nurses shared the responsibilities for the residents in Section Three.  Lewis was responsible for providing care to half of the residents (about twenty-four to twenty-five), while another nurse was responsible for taking care of the remaining Section Three residents.  Each nurse did the following for his/her assigned residents: conducted two rounds of dispensing medications; provided necessary treatment/wound care; took physician's orders; and completed medical charts.

### B.  Lewis's Thyroid Condition

---

[3] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor."  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (alteration in original) (internal quotation marks omitted).

In approximately late 2007 or early 2008, Lewis began to lose weight and to experience weakness in her body.  This weight loss was noticed by Lewis's 3-11 shift supervisor, Robert Gill, as well as by the Director of Nursing, Margaret Wilkie.  Both Supervisor Gill and Director Wilkie were concerned about Lewis's weight loss.

In the summer of 2008, Lewis was diagnosed with a thyroid condition known as Grave's disease.  In separate conversations, Lewis informed Supervisor Gill, Director Wilkie, and her unit manager, Susan Francis, that she had a thyroid condition.  Lewis told Manager Francis that she "was having problems, . . . was weak, and . . . had a thyroid problem, and what it was . . . ." Lewis Dep. 202:5-16.  Lewis also explained to Supervisor Gill "that she had a thyroid problem. She told [him] that they were having a hard time controlling it.  And then over the course of conversations, she said she was hopeful they were going to get it under control."  Gill Dep. 15:20-16:3.  Supervisor Gill noticed that Lewis's hands would shake when she was working. Additionally, he observed that Lewis was slow in performing her job. Gill Dep. 16:20-17:8.

Due to her thyroid condition, Lewis experienced difficulty performing some aspects of her job as an LPN.  Specifically, Lewis had difficulty standing on her feet for long periods of time, pushing the med cart, and administering eye drops and insulin injections.  Lewis Dep. 179:19-180:3.  Additionally, she experienced general exhaustion and weakness.  Lewis Dep. 180:5-6.

As a result of these difficulties, Lewis had to park the med cart in the middle of the hallway when she was dispensing medications to residents and walk back and forth to it rather than pushing it the entire time, and she had to sit down about halfway down the hallway and rest for five minutes before administering medications to the remaining residents assigned to her.

3

Lewis Dep. 181:15-24.  Additionally, when Lewis's hands were really shaky, she would have another nurse give eye drops to her residents.  Lewis Dep. 203:8-21.  No one had any problem with Lewis parking her cart in the hallway and taking a five minute break in the middle of passing out medications or with other nurses administering eye drops to the residents assigned to Lewis.  Lewis Dep. 181:25-182:8, 203:22-204:25.  Moreover, although Lewis's thyroid condition slowed her down, no supervisor or manager ever complained, or commented in a negative manner, about Lewis's productivity.  Lewis Dep. 183:5-184:17.

In addition to affecting Lewis's ability to perform certain job functions, Lewis's thyroid condition impacted other areas of her life.  Lewis could not walk or stand for more than forty-five minutes, after which she would need to take a break for five or ten minutes.  Lewis Dep. 275:12-19.  Additionally, Lewis could not climb more than three flights of stairs. Lewis Dep. 274:22-25.  Lewis could not carry more than fifteen pounds; thus she could not carry heavy groceries or laundry, and she experienced difficulty using her vacuum that weighed approximately fifteen to twenty pounds.  Lewis Dep. 272:12-20, 276:12-277:6. Furthermore, Lewis could not shovel snow, open jars, or scrub floors.  Lewis Dep. 276:2-5, 278:2-18.

### C.  Garden Spring Center's Planned Change in the Nurse Coverage System

In October 2008, Garden Spring Center announced that it was going to change its staffing system beginning on November 1, 2008.  Under the old system, two nurses were assigned to each Section of the facility and each nurse on the Section performed all of the nursing duties for half of the residents. The new system created a "medication nurse" and a "charge nurse" for each Section.  The medication nurse would be responsible for dispensing medications to all of the residents in the Section.  The charge nurse would be responsible for all other nursing duties,

4

including charting, wound care, and desk duties.  Many nurses, including Lewis, objected to this

change because they felt it would be difficult for one nurse to pass medications to all residents.

Lewis was informed by Manager Francis, that when the new system was implemented,

she would be transferred to Section One to serve as the medication nurse.  Lewis 68:17-69:12.

Section One had twenty-six residents, and was much smaller than Section Three, which had

forty-nine residents.  98:4-10.  Manager Francis planned to transfer Lewis to Section One

because she thought it would be easier for her there.  Lewis Dep. 68:22-25.  Lewis believed that

if she became the medication nurse on Section One she would be standing and passing out

medications for her entire eight hour shift.  Lewis Dep. 63:24-64:5.  Lewis told Manager Francis

that she believed her new assignment was unfair because she could not stand and pass out

medications for her whole shift.  Lewis Dep. 63:6-64:5.  Additionally, Lewis told Manager

Francis that she would like to stay on Section Three, but Francis said, "[N]o, you're going to

Section [One]."  Lewis Dep. 70:8-16.

### D.  The October 23, 2008 Incident and Lewis's Termination

On the evening of October 23, 2008, Lewis was working at Garden Spring Center.  She

was at the ice bucket filling a resident's cup when she saw Resident A,[4] who was in a wheelchair,

approach and speak to Teri Ripley, the other nurse on duty in Section Three.  Following this

exchange, Nurse Ripley left her med cart and went to Room 203, the room shared by Resident A

and Resident B.  Resident A then approached Lewis, screaming and hollering, "[Resident B] is

going to kill himself."  Lewis Dep. 149:13-19.  Before Lewis could put down the ice cup,

---

[4] To protect their privacy rights, the residents of Garden Spring Center involved in this incident
will be referred to as Resident A and Resident B.

Resident A knocked the cup out of her hand, spilling ice on the carpeted floor in front of a resident lounge.  There were four or five residents in the lounge who would have to cross over the area where the ice was spilled in order to exit.  Lewis stopped and kicked the ice cubes to the side of the floor because she knew that Nurse Ripley had already gone to Room 203.  It took Lewis no more than thirty seconds to clean up the ice.  Then Lewis went to Room 203 to help Nurse Ripley with Resident B.  Resident B had slashed through his nightgown. When Lewis arrived, she observed that Nurse Ripley had taken a pair of scissors away from Resident B.

The day after the incident, Patricia Keyes, the Garden Spring Administrator, received a verbal complaint from Resident A that his roommate had attempted to commit suicide, and that a nurse had not responded in a timely manner.  Administrator Keyes informed Manager Francis of Resident A's complaint and asked her to speak with Resident A.  Manager Francis wrote down Resident A's account of the suicide incident, which stated the following: "Later that night I saw [Resident B] with scissors and he was trying to kill himself.  I got up into w/c [wheelchair] and went to nurse and she said I had something/someone in to see Resident B, I will be there.  It seemed like 5-10 minutes before the nurse came down."  Def. Ex. P.  In this account, Resident A also stated that earlier in the day, around lunch or dinner, he had reported to a male nurse that Resident B was talking about killing himself.  At the time Resident A allegedly reported his concern to a male nurse, there were no male nurses on duty.  Garden Spring Center never determined whether Resident A made this statement to someone he mistook for a male nurse or whether the statement was a fabrication.

Following the suicide incident, Lewis also wrote an account of what had occurred.  She provided the following explanation:

6

> [Resident A] rolled up to me and started yelling that his roommate was trying to kill himself. I was getting ice from the ice container for another resident. Resident A knocked the ice cup out of my hand and spilled ice all over the floor. I cleaned up the ice and went to resident's room. The resident's nurse was already there. Resident B was put on suicide precautions. Nurse's aide was sent to stay with him.

Pl. Ex. K. Later, Lewis provided a second statement, which clarified that she cleaned up the ice by "kick[ing] it to the side of the floor." Pl. Ex. M. Additionally, Nurse Ripley also provided a statement.

On October 28, 2008, Director Wilkie and Manager Francis met with Lewis and informed her that she was being suspended, pending investigation, for her failure to timely respond to Resident B's suicide attempt. At this meeting, both Director Wilkie and Manager Francis appeared angry that Lewis had failed to respond immediately to Resident A's concern.

Following Lewis's suspension, Director Wilkie recommended to Administrator Keyes that Lewis be terminated for gross misconduct. Administrator Keyes made a preliminary decision to fire Lewis. However, prior to terminating Lewis, Administrator Keyes contacted the Director of Human Resources to inform her about the incident. Keyes Dep. 17:3-19:1. Administrator Keyes then made the final decision to terminate Lewis. On October 31, 2008, Director Wilkie met with Lewis and informed her that she was being terminated immediately for gross misconduct for her delay in responding to an emergency situation.

### E.  Lewis's Discrimination and Failure to Accommodate Allegations

At the time Lewis was terminated, she was sixty-four years old, she was the oldest LPN at Garden Spring Center, and she had a thyroid condition. In January 2009, Garden Spring Center hired Cherise Jefferson Holmes, a thirty-year-old LPN, to replace Lewis.

Lewis contends that Garden Spring Center's real reason for firing her was because of her age and/or her thyroid condition.  Lewis acknowledges that no one in management ever made any comments about Lewis's age.  Lewis Dep. 179:7-9.  Additionally, while Lewis contends that Garden Spring Center terminated her because her thyroid condition slowed her down, Lewis acknowledges that no supervisor or manager ever commented in a negative manner, or complained, about Lewis's productivity.  Lewis Dep. 182:25- 183:4,184:10-17.  Furthermore, there are no facts in the record that anyone ever commented about Lewis's thyroid condition in a negative manner or took any actions against her as a result.

However, the record does establish that Lewis was six years older than any other LPN at Garden Spring Center when she was terminated.  Additionally, Lewis earned $28.97 per hour at the time of her termination, while her replacement only earned $22.00 per hour.  Lewis Dep. 264:4-13; Keyes Dep. 60:3-15.

## II.  LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.  *Id.*

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  In ruling

on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

### A.  Disability Discrimination

Lewis alleges that Garden Spring Center discriminated against her in violation of the ADA when it failed to accommodate her and terminated her employment as a result of her thyroid condition.  Under the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*,184 F.3d 296, 306 (3d Cir. 1999).

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the

employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir.1998).  Garden Spring Center contends that Lewis cannot establish a prima facie case of discrimination under the ADA because her thyroid condition is not a disability as defined by the ADA.[5]  The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(2).[6]  Lewis argues that her thyroid condition qualifies as a disability under either subsection A or subsection C of this definition.

### 1. Whether Lewis Has A Physical Impairment That Substantially Limits A Major Life Activity

---

[5] Garden Spring Center also contends that Lewis cannot establish a prima facie case of discrimination under the ADA because she is not qualified to perform the essential functions of the job.  I do not reach this issue because I conclude below that Lewis has failed to establish that she is disabled within the meaning of the ADA.

[6] I recognize that amendments to the ADA took effect on January 1, 2009.  *See* ADA Amendments Act of 2008, Pub. L. 110-235, 122 Stat. 3553 (2008).  However, I refer to the law as it existed prior to the amendments because the events giving rise to Lewis's claims occurred prior to when the amendments became effective, and neither party contends that the amendments should apply to this case.  *See Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 n.2 (3d Cir. 2010) (applying the ADA and its regulations as they existed prior to the ADA Amendments Act where the parties did not argue that the amendments had retroactive effect).  Additionally, I decline to retroactively apply the amendments because the Court of Appeals for the Third Circuit has stated, albeit in a not-precedential opinion, that the amendments cannot be applied retroactively.  *Britting v. Sec'y, Dep't of Veteran Affairs*, 409 Fed. Appx. 566, 569 (3d Cir. 2011) (not precedential).  Moreover, it has also recognized that all other circuit courts that have reached the issue "have uniformly concluded that the ADAAA is not retroactively applicable."  *Id.* at 569 n.3 (citing *Ragusa v. Malverne Union Free Sch. Dist.*, 381 Fed. Appx. 85, 87 n.2 (2d Cir. 2010); *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010); *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 34 n.3 (1st Cir. 2009); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Fredricksen v. United Parcel Serv.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009); *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 940-42 (D.C. Cir. 2009); *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009); *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).

Lewis contends that her thyroid condition is a physical impairment that substantially limits one or more major life activities.  The EEOC regulations define "substantially limits" as follows:

> "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

*Taylor v. Phoenixville*, 184 F.3d at 307 (quoting 29 C.F.R. § 1630.2(j)(1)).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). "'Major life activities' thus refers to those activities that are of central importance to daily life." *Toyota Motor Mfr., Ky. V. Williams*, 534 U.S. 184, 197 (2002).  "[T]hese terms need to be interpreted strictly to create a demanding standard for qualifying as disabled . . . ."  *Id.*  A court must make an "individualized assessment" of a plaintiff's condition in order to determine whether a person qualifies as disabled.  *Taylor v. Phoenixville*, 184 F.3d at 306.

Garden Spring Center does not contest that Lewis's thyroid condition is a physical impairment.  Rather, the parties dispute whether this impairment substantially limited a major life activity.  Lewis alleges her thyroid condition affected her major life activity of working.  Due to her thyroid condition, Lewis could not stand or walk for more than forty-five minutes, her hands were often shaky, and she could not carry more than fifteen pounds.  Lewis contends that these symptoms of her thyroid condition impacted her ability to work as an LPN at the Garden

Spring Center in that she could not stand or push the med cart for long periods of time without taking a brief rest, she sometimes had to take a rest while working, and, when her hands were particularly shaky, Lewis needed the assistance of another nurse to administer certain drugs.

"When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999). Therefore, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* at 492. Lewis only alleges that her thyroid condition prevented her from performing certain tasks as an LPN at the Garden Spring Center. Her claim that she is substantially limited in the major life activity of working is deficient because she has not alleged that she is unable to work a broad class of jobs.

Lewis also appears to argue that she is substantially limited in the major life activities of standing, walking, and lifting. In determining whether someone is substantially limited in a major life activity, "[t]he relevant question is whether the difference between his ability and that of an average person is qualitatively significant enough to constitute a disability." *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 186 (3d Cir. 1999). Lewis is unable lift more than fifteen pounds, and she cannot stand or walk for more than forty-five minutes at a time before she needs a short break. Her abilities to lift, stand, and walk are not significantly less than that of the average person. Therefore, she is not substantially limited in the major life activities of lifting, standing, or walking. *See Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 364 (3d Cir. 2000) (holding that a plaintiff who was restricted from lifting more than ten pounds was not "sufficiently different from the general population such that he is substantially limited in his

12

ability to lift"); *Taylor v. Pathmark*, 177 F.3d at 186-87 (holding that a plaintiff who could walk or stand for fifty minutes without rest was not disabled because "his ability to walk and stand [was] not significantly less than that of the average person").

Lastly, Lewis argues that she is substantially limited in her daily activities of carrying heavy bags of groceries, doing laundry, difficulty climbing stairs, opening drawers, and cleaning her home.  Although Lewis contends that she cannot do laundry, Lewis's own deposition testimony makes clear that she can do laundry, but cannot carry heavy bags of laundry. *See* Lewis Dep. 272:10-23.  As previously discussed, Lewis's inability to carry more than fifteen pounds is not sufficiently different than that of the average person.  From this conclusion, it follows that her inability to carry more than fifteen pounds of groceries or laundry is also not sufficiently different than that of the average person and therefore, these limitations do not render Lewis disabled.  As for Lewis's inability to clean her home, Lewis clarified in her deposition testimony that her only difficulty with cleaning is that she cannot scrub floors.  *See* Lewis Dep. 278:5-18. However, scrubbing floors is not a major life activity.  *Marinelli*, 216 F.3d at 363.  Therefore, Lewis's inability to scrub floors does not make her disabled.  Additionally, while Lewis contends that she cannot open drawers, the record is devoid of any evidence of this claim.  Thus, this unsupported assertion cannot form the basis for a determination that Lewis is disabled.  Finally, Lewis cannot climb more than three flights of stairs at a time.  Lewis's stair climbing ability is not significantly less than that of the average person.  Therefore, her difficulty climbing stairs does not render Lewis disabled.

Lewis has failed to establish that her thyroid condition substantially limits any major life activity.[7]

### 2.  Whether Lewis Was Regarded as Disabled

Lewis argues that she qualifies as disabled under the ADA because Garden Spring Center regarded her as disabled.  A plaintiff is "regarded as" having a disability if s/he:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by the covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has [no such impairment] but is treated by a covered entity as having a substantially limiting impairment.

*Taylor v. Pathmark*, 177 F.3d at 187 (alteration in original) (quoting 29 C.F.R. § 1630.2(l) (1996)).  In a "regarded as" case, the analysis "focuses not on [the plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him."  *Kelly v. Drexel Univ.*, 94 F.3d 102, 108-109 (3d Cir. 1996).  "[I]n general, an employer's

---

[7] Lewis relies on *Harris v. H & W Contracting Co.*, 102 F.3d 516 (11th Cir. 1996), to argue that Graves' disease is considered a disability as defined by the ADA.  This argument is flawed for two reasons.  First, whether an impairment is a disability is a determination that must be made "on a case-by-case basis."  *Marinelli*, 216 F.3d at 362.  Second, in *Harris*, the Court of Appeals for the Eleventh Circuit only determined that the evidence was sufficient to create a genuine issue of material fact about whether the plaintiff's Graves' disease substantially limited a major life activity of the plaintiff in the absence of mitigating measures; specifically, in the absence of thyroid medication.  102 F.3d at 522-23.  However, following the decision in *Harris*, "the Supreme Court held that a court must look at an ADA plaintiff's impairment *after* corrective measures are taken-e.g., medication, eyeglasses-in order to determine whether such an impairment was substantially limiting to the plaintiff's major life activities."  *Marinelli*, 216 F.3d at 362 n.4 (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555(1999); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)).

perception that an employee cannot perform a wide range of jobs suffices to make out a 'regarded as' claim." *Taylor v. Pathmark*, 177 F.3d at 188.  However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled . . . ." *Kelly*, 94 F.3d at 109.

While there is evidence that several of the managerial staff were aware of Lewis's thyroid condition, there is no evidence that anyone perceived that Lewis's thyroid condition prevented her from doing a wide range of jobs.  Although Supervisor Gill noticed that Lewis's hands would shake and that she was slower in performing her job than she had been, there is no evidence that anyone at Garden Spring Center perceived Lewis's thyroid condition as substantially limiting any major life activities or her ability to perform her job as an LPN.  Therefore, Lewis has failed to establish that Garden Spring Center regarded her as having a disability under the ADA.[8]

### B.  Age Discrimination

The ADEA prohibits age discrimination in employment decisions against persons who are at least forty years old.  *Kelly*, 94 F.3d at 104 (citing 29 U.S.C. § 623(a)(1)).  "In *McDonnell Douglas*, the Supreme Court created a special scheme for structuring the presentation of evidence in discriminatory treatment cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq."  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This burden-shifting framework provided by *McDonnell Douglas* has been extended to apply to discriminatory treatment cases

---

[8] Clearly, Lewis's failure to accommodate claim cannot survive summary judgment because Lewis's thyroid condition is not a disability; thus, Garden Spring Center had no duty to accommodate her impairment.

under the ADEA.  *E.g., Keller*, 130 F.3d at 1108 (recognizing that the *McDonnell Douglas*

burden-shifting analysis applies to ADEA disparate treatment claims).

The *McDonnell Douglas* burden-shifting analysis proceeds in three steps.  *Keller*, 130

F.3d at 1108.  First, the plaintiff must establish a prima facie case of discrimination.  *Id*.  If the

plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the

defendant to produce evidence that it had a legitimate nondiscriminatory reason for the discharge.

*Id.*  "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity

to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination."  *Jones v. Sch. Dist. of Phila.*,

198 F.3d 403, 410 (3d Cir. 1999).  While the burden of production shifts at each step of the

*McDonnell Douglas* analysis, the plaintiff bears the burden of persuasion at all times.  *Smith v.*

*City of Allentown*, 589 F.3d 684, 689-90 (3d Cir. 2009).

The parties dispute whether Lewis has established a prima facie case of discrimination

under the ADEA.  Lewis agrees that Garden Spring Center has met its burden at step two of the

*McDonnell Douglas* analysis by presenting a legitimate nondiscriminatory reason for her

termination— that it fired Lewis because she engaged in gross misconduct when she failed to

timely respond to Resident A's concern that his roommate was attempting to commit suicide.

Lastly, the parties dispute whether Lewis has established that Garden Spring Center's legitimate

nondiscriminatory reason for her termination is in fact pretext.

In order to establish a prima facie case of disparate treatment under the ADEA, a plaintiff

must show that at the time of his termination: (1) he was a member of the protected class; that is

he was at least 40 years of age; (2) he was qualified for the job; (3) he was discharged; and (4) he

was replaced by a sufficiently younger person to create an inference of age discrimination. *Keller*, 130 F.3d at 1108. Garden Spring Center argues that Lewis cannot establish prong two of a prima facie case of discrimination under the ADEA because her failure to respond to Resident A's concern that his roommate was going to commit suicide rendered her unfit for her position at the time of termination. For Garden Spring Center to succeed on this point, I would have to agree that the real reason it terminated Lewis was because she engaged in gross misconduct that rendered her unqualified for the job. However, that question has yet to be resolved. That Lewis performed her job for nearly twenty years sufficiently establishes that she was qualified for the job. Therefore, Lewis has established a prima facie case of discrimination under the ADEA.

Lewis agrees that Garden Spring Center has presented a legitimate nondiscriminatory reason for Lewis's termination. Thus, the only remaining question is whether Lewis can establish that a genuine issue of material fact exists as to whether Garden Spring Center's proffered reason for her discharge is in fact pretext.

To establish that an employer's legitimate nondiscriminatory reason for discharge is pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Accordingly, the Court of Appeals of the Third Circuit has explained that:

> To discredit the employer's proffered reason . . . the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

17

*Id.* at 765 (alteration in original) (citation omitted) (internal quotation marks omitted).  "[I]f the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgement the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case."  *Id.* at 764.

Lewis argues that there is evidence from which a reasonable factfinder could disbelieve that Garden Spring Center terminated her for gross misconduct related to Resident B's suicide attempt.  Lewis points out that Garden Spring Center only performed a very cursory investigation of the incident, and never questioned Lewis as to how long it took her to respond to Resident A's concern about her roommate.  Lewis alleges that the fact that she only took thirty seconds to kick the ice to the side before responding to the suicide threat demonstrates that this incident could not be Garden Spring Center's real reason for her termination.

Additionally, Lewis contends that the timing of the termination is suspicious.  Indeed, Lewis was fired the day before the new nurse coverage system went into effect, a system that Lewis had told her supervisors she believed was unfair.  Moreover, only a week or two before she was fired, Lewis had objected to her manager's decision to make her a medication nurse under the new system, and told her manager she was incapable of performing this new position because she could not stand and pass out medications for her whole shift.  Furthermore, Lewis's termination came only a few months after her diagnosis with Graves' disease.

Given this, and other evidence presented by Lewis, a genuine issue of material fact exists as to whether Garden Spring Center's legitimate nondiscriminatory reason for her termination is

actually pretext.  Therefore, I will deny Garden Spring Center's motion for summary judgment on Lewis's claim that she was terminated in violation of the ADEA.

## IV.  CONCLUSION

For the reasons stated above, I will grant Garden Spring Center's motion for summary judgment on Lewis's ADA claims, and deny the motion on Lewis's ADEA claim.


s/Anita B. Brody

_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:              Copies **MAILED** on _____ to:


O:\ABB 2011\L-Z\Lewis v. Genesis Summary Judgment Memorandum.wpd